UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present:    Chief Judge Decker, Judge AtLee and Senior Judge Humphreys
Argued by videoconference

LEROY BRUCE SMITH

                                                        MEMORANDUM OPINION* BY
v.        Record No. 1280-24-3                  JUDGE ROBERT J. HUMPHREYS
                                                           AUGUST 26, 2025

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF ALLEGHANY COUNTY
Edward K. Stein, Judge

James V. Doss, III, for appellant.

Sheri H. Kelly, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Under a written plea agreement, the trial court convicted Leroy Bruce Smith of three

counts of aggravated sexual battery, three counts of object sexual penetration, three counts of

forcible sodomy, and one count of producing child pornography.  On appeal, he argues that the

trial court erred by accepting an "open" plea agreement that did not have "a recommendation of

sentence."  He also argues that the trial court abused its discretion by denying his motion to

withdraw his guilty plea and imposing 60 years of active incarceration.  Finding no reversible

error, we affirm.

BACKGROUND

"On appeal, we state the facts in the light most favorable to the Commonwealth," the

prevailing party below.  *Newsome v. Commonwealth*, 81 Va. App. 43, 48 (2024) (citing *Poole v.

Commonwealth*, 73 Va. App. 357, 360 (2021)).  A grand jury indicted Smith for a total of 37

---

* This opinion is not designated for publication.  *See* Code § 17.1-413(A).

charges related to the sexual abuse of his step-granddaughter, U.R. The charges included multiple counts of aggravated sexual battery, rape, object sexual penetration, sodomy, taking indecent liberties, and production of child pornography.

In September 2023, Smith signed a plea agreement providing that he would plead guilty to ten charges: three counts of aggravated sexual battery, three counts of object sexual penetration, three counts of forcible sodomy, and one count of producing child pornography. In exchange, the Commonwealth would move to nolle prosequi the remaining charges. In addition, the Commonwealth agreed that Smith's "active sentence may include any term of years but not specifically life." In the agreement, Smith explicitly waived "any right to appeal the decision" of the trial court. He also acknowledged that he understood the maximum sentences he could receive and that the trial court was not bound by the discretionary sentencing guidelines.

Before accepting Smith's pleas, the trial court conducted a thorough colloquy to ensure he had entered them freely and voluntarily. Smith stated that he understood the charges against him and had discussed them with his attorney. After that discussion, he decided to plead guilty "freely and voluntarily" because he was, "in fact, guilty." He acknowledged that his pleas waived several constitutional rights, including the rights to a trial by jury, to confront the witnesses against him, and not to incriminate himself. Nobody had threatened or forced him to enter his pleas. He understood the "maximum punishment" for each charge and that the felony convictions would have certain "civil consequences." He knew that the discretionary sentencing guidelines did not bind the trial court and that by signing the plea agreement he had waived his right to appeal. Smith asserted that he had read, understood, and signed the plea agreement. He understood the benefit it gave him—the nolle prosequi of numerous charges—and that there was "no agreement with regard to [his] sentence other than that [he would] not receive . . . a life sentence." He had received "no offers . . . that included a specific term of incarceration." Smith understood all of the trial court's questions,

- 2 -

stated that he was satisfied with his attorney, and declined the opportunity to ask the trial court any questions.

The Commonwealth proffered that from January 2006 through January 2008, Smith's step-granddaughter, U.R., who was under 13 years old, lived in his home with her grandmother. Smith "molested" U.R. "on a nearly daily basis over a period of around seven years." Although Smith "did not achieve full penile penetration into [her] vaginal vault, he penetrated her labia majora with his penis, tongue and fingers." U.R. told police that Smith "would make her do things like lie on the bed naked [and] hold his penis," and he would "touch and put her breast in his mouth and take photographs of her while she laid naked," all when she was "between the ages of" 5 and 12. He also would "rub his penis on her vagina while penetrating her labia majora" during the same time period "on a nearly daily basis." In addition, "when she returned home from school," he "would routinely perform cunnilingus on her by using his tongue to penetrate her labia majora." He also "masturbate[d] in front of her when she was lying on the bed routinely."

In a recorded phone call after Smith was incarcerated, he admitted that "some of that stuff might be true, I'm not that person anymore." In 2023, Virginia State Police found child pornography that Smith had made of U.R. "while she was under thirteen in a tanning bed he had set up in the garage." One video was timestamped in 2008, a second in 2013. In the first video, Smith zoomed in on U.R.'s "breasts and genitals." The second video depicted Smith "placing a hidden camera" and "removing a naked" U.R. "from the tanning bed." A third video recorded Smith masturbating in the same garage.

The trial court accepted Smith's pleas, finding that he had entered them freely and voluntarily, understanding their nature and consequences. Further, based on the Commonwealth's proffer, the court found that there was "a factual basis to support" the charges. Accordingly, the court convicted Smith under the terms of the plea agreement and continued the matter for

sentencing. The court also granted the Commonwealth's motion to nolle prosequi the remaining charges.

Before the sentencing hearing, Smith moved to withdraw his guilty pleas, asserting that "he did not fully understand the consequences" of his pleas and "there [were] substantive defenses" he could raise. At a hearing on his motion, Smith testified that he wanted a jury trial. He asserted that on the day he entered his pleas, he "didn't know what was going on," and his attorney had given him "only . . . ten minutes to make a decision." His attorney told him the plea agreement was "about as good as [he was] going to get," which compelled his "submission to guilt to something [he] did not do." On cross-examination, he acknowledged that he had discussed the proposed plea agreements with his attorney before the plea hearing. He had rejected a prior agreement, asking the Commonwealth "to take the rape charges out," and the agreement ultimately "was changed at [his] request."

Smith also alleged that the Commonwealth's proffered evidence had "twisted everything" to things he "did not agree to." He lamented that he would "lose everything," including his "railroad return pay" during any period of incarceration, and that his family would have to leave their home and "find a new place to live." Smith's "defense" to the charges was: "it's not true." He testified, "I didn't do this. I'm being charged for something . . . I did not do. If I did this . . . I would own up to it. But I did not do the charges [that] are being brought against me." He maintained that he knew U.R., "love[d]" her, and would not "do this to hurt" her. Smith also proffered that the video of him masturbating had been deleted and restored by "technological magic," so it was "highly fragmented and . . . just a series of disorganized clips."

Smith argued that "the least surprise or influence" causing a defendant to plead guilty is sufficient to withdraw his pleas. He maintained that his pleas were entered by mistake and under a misconception of the charges and their effect, specifically the "railroad situation." Losing his

"legacy" was an "enormous shock." He also contended that his proffered defense was not "merely formal" because it included "a specific offer of facts." He asked the court to consider the seriousness of the charges and that he was 70 years old, meaning any substantial sentence "would put him in jail for the rest of his life." Finally, he asserted that the Commonwealth would not be prejudiced.

The trial court denied Smith's motion to withdraw his pleas. The court found that Smith demonstrated neither a good-faith basis for his motion nor a reasonable defense to justify a trial on the merits. The court emphasized Smith's acknowledgment during the colloquy that he was pleading guilty because he was "in fact guilty" and that Smith had "made no additions or corrections" to the Commonwealth's proffered evidence at the plea hearing. The court found that Smith had been "actively involved" in negotiating the plea agreement and had "a simple case of buyer's remorse."

At the sentencing hearing, the trial court received two victim impact statements written by U.R. She wrote that she was "alone as a child" after "losing [her] [m]other" and Smith took "advantage of [her] cry for love and attention." Painful memories haunted her, even keeping her from being able to use a sliding door in her home because it reminded her of how "every day after school" a sliding door in Smith's home "would slide shut for [their] alone time and slide open when Nana would call to say she was on her way home." She lamented not only the consequences to her, but also to her grandmother and other family members who "struggled mentally." Some days, she struggled to leave her bed, and she continuously worried that the same thing would happen to her daughter. She lamented the loss of "innocence as a child" and growing up "without knowing what love was." She wrote that she "never understood why" it happened and still suffered from "extreme anxiety." U.R. also testified at the sentencing hearing, reading one of her victim impact statements.

Victoria Cash-Graff, a licensed clinical social worker, prepared a psycho-sexual evaluation on Smith for the sentencing hearing. After reviewing the case and meeting with Smith for over two hours, she "believe[d] that he [was] a pedophile . . . [u]nexclusive," meaning he could "perform sexually with adults but . . . ha[d] a deviant sexual interest towards children." She reported that the issue was "serious" and needed to be investigated and "addressed immediately." A risk assessment tool indicated that Smith was at a "very low risk" of reoffending based on his age and lack of criminal history. During Cash-Graff's interview with Smith, he did not "acknowledge responsibility for any hands on offending of his victim" but admitted "taking the nude images of a minor." Even then, he denied "any sexual intent and state[d] that it was used as a deterrent to keep her from coming to the tanning bad while he was in there working." He admitted there was a video of him masturbating, claiming that it was with a consenting adult over the internet. He was adamant that the charges were manufactured by a "disgruntled ex-wife . . . for revenge."

Debbie Branch, Smith's younger sister, testified that their family split when she and Smith were children. She saw Smith each summer. Branch described Smith as a "sweet," "very good young man" who "never got in any kind of trouble" and had a "good work ethic," obtaining a job around 15 years old. He also worked "for the railroad and . . . on the farm with [their] grandparents." Smith lived with his grandmother after their grandfather died, caring for her and her property. Smith also helped Branch after she suffered a brain aneurysm. Wesley Smith, Smith's half-brother, agreed with Branch's testimony. Wesley "just couldn't believe any" of the allegations against Smith.

Smith's neighbor, Lowman, described him as "a very upstanding, caring community person." She had known him to be "a charitable and giving and loving God-fearing man." Lowman offered to allow Smith to live with her if he was released and needed a place to stay.

- 6 -

Similarly, Smith's friend since grade school, Ray Thomas, described Smith as a "good guy" with strong "character."

Smith, who was 70 years old, testified that his record consisted of only a speeding ticket. He always tried to help his neighbors and be a mentor. He had worked as a railroad electrician but was "put on disability" in 2006. He suffered from several physical ailments. He asserted that he was "coerced" by his attorney into signing the plea agreement. He did not think it was "fair that only one side of the story was to be heard," and he had accepted his attorney's "word" that the agreement represented the "best" outcome he could expect. He again "admitted to the videos," repeating his claim that it was "a deterrent method" to keep U.R. from entering his garage "naked." Smith admitted that he had "made mistakes," including with the "video camera," and that one of the videos depicted him locking the door to the garage while U.R. was inside with him while naked. He also admitted that, in another video, U.R. stated that she had "caught" him looking at her as she was naked in the tanning bed. And in another video, Smith admitted that he had "panned the video up and down [U.R.'s] body, zooming in and pausing on her breasts and pubic area," explaining that U.R. "was plum buck naked" and "could have stopped coming out there on her own if she wanted." Refusing to fully accept responsibility, Smith "figure[d]" the videos were U.R.'s "fault" because "she knew" he was in the garage and he did not "call her out there." Blaming his minor victim, he said, "she supplied me a view." Nevertheless, he denied hurting U.R. and claimed that he "loved" her.

The Commonwealth asked the trial court to impose a total of 70 years' incarceration, arguing that the discretionary sentencing guidelines were inappropriate because it was "not possible to make the punishment fit the crimes he perpetrated on her day after day for seven

years."[1]  It argued that this was a case of "a child molester who got away with it for years."  He "preyed on a little girl he was supposed to nurture and protect" and "who trusted him."  He "poisoned" U.R.'s past, present, and future.  The Commonwealth emphasized that Smith continued to deny his offenses and call U.R. a liar.  His explanation that the videos served as a deterrent was "absurd and incredible."

Smith, in turn, argued that given his age and remaining life expectancy, a sentence of even 13 years' active incarceration was "effectively the rest of his life."  He emphasized the witnesses who testified to his character and that his record contained only traffic offenses.  He asserted that the court would never "see him again," especially given that the offenses occurred in 2006 to 2008, and there was no indication that he had committed offenses in the 16 years since.

On the three counts of object sexual penetration, the trial court sentenced Smith to life imprisonment, suspending all but 40 years on each offense to be served concurrently.  On the three counts of forcible sodomy, the court imposed life imprisonment, again suspending all but 40 years on each offense to be served concurrently with the sentences for the object sexual penetration convictions.  On the aggravated sexual battery convictions, the court imposed 20 years' incarceration, all suspended.  And on the production of child pornography conviction, the court imposed 20 years' incarceration with 10 years suspended.  Smith appeals, arguing that the trial court erred by accepting an "open" plea agreement, denying his motion to withdraw his pleas, and sentencing him to excessive active incarceration.

---

[1] The sentencing guidelines recommended between 26 years and 10 months' incarceration and 42 years and 11 months' incarceration, with a midpoint of 35 years and 9 months.

ANALYSIS

I. "Open" Plea Agreement

"No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable this Court to attain the ends of justice." Rule 5A:18. The "contemporaneous objection requirement . . . allow[s] the trial court a fair opportunity to resolve the issue at trial, thereby preventing unnecessary appeals and retrials." *Hogle v. Commonwealth*, 75 Va. App. 743, 755 (2022) (quoting *Creamer v. Commonwealth*, 64 Va. App. 185, 195 (2015)). "Specificity and timeliness undergird the contemporaneous-objection rule, animate its highly practical purpose, and allow the rule to resonate with simplicity." *Id.* (quoting *Bethea v. Commonwealth*, 297 Va. 730, 743 (2019)). "Not just any objection will do. It must be both specific and timely—so that the trial judge would know the particular point being made in time to do something about it." *Id.* (quoting *Bethea*, 297 Va. at 743). "If a party fails to timely and specifically object, he waives his argument on appeal." *Id.* (citing *Arrington v. Commonwealth*, 53 Va. App. 635, 641 (2009)).

Smith argues that the trial court erred by accepting his "open" plea agreement because it did not have a fixed "recommendation of sentence." He asserts that such agreements "are a form of process trap whereby a defendant is gulled into believing that he may reasonably argue the low end of the Sentencing Guidelines, not realizing that" the guidelines are "discretionary, only limited by the Commonwealth's recommended cap."[2] Smith, however, did not argue below that the trial court should not accept his plea agreement because it was "open" and did not contain a fixed sentence. Rather, during the plea colloquy after he entered his pleas, he acknowledged that

---

[2] The record belies Smith's argument that he did not "realiz[e]" the discretionary sentencing guidelines were discretionary. Both in the written plea agreement and during the colloquy, Smith acknowledged that the trial court was not bound by the guidelines.

the agreement did not contain a fixed disposition and that he could "receive anything lower than a life sentence." Smith did not raise the specific argument he raises on appeal; indeed, he presented no objection to the plea agreement's form below. Thus, his argument is not preserved under Rule 5A:18. Although there are exceptions to Rule 5A:18, Smith does not invoke them, and we will not apply the exceptions sua sponte. *Terry v. Commonwealth*, 81 Va. App. 241, 254 n.4 (2024) (citing *Edwards v. Commonwealth*, 41 Va. App. 752, 761 (2003) (en banc)).

## II. Motion to Withdraw Guilty Pleas

"[W]hether to grant or deny the withdrawal of a plea 'is a matter that rests within the sound discretion of the trial court and is to be determined by the facts and circumstances of each case.'" *Commonwealth v. Holland*, ___ Va. ___, ___ (Jan. 16, 2025) (quoting *Parris v. Commonwealth*, 189 Va. 321, 324 (1949)). Such motions "'are governed by two separate standards,' depending on whether the motion comes before or after . . . sentencing." *Id.* at ___ (quoting *Brown v. Commonwealth*, 297 Va. 295, 299 (2019)). A "pre-sentencing plea-withdrawal motion should be granted in one of two situations: either when the defendant's guilty plea was 'made involuntarily,' or it was 'entered inadvisedly, if any reasonable ground is offered for going to the jury." *Id.* at ___ (quoting *Brown*, 297 Va. at 299). In addition, when a defendant alleges that he entered his plea "inadvisedly," he "bears the burden" of showing:

> "(1) the plea of guilty was submitted in good faith under an honest mistake of material fact or facts . . .; (2) the evidence supporting the motion shows that there is a reasonable defense to be presented to the charge; (3) granting the motion will not unduly prejudice the Commonwealth; and (4) the motion to withdraw the plea was not filed merely to cause undue delay in the administration of justice or [otherwise represents] bad faith or misconduct by or on behalf of the defendant."

*Id.* at ___ (alterations in original) (footnote omitted) (quoting *DeLuca v. Commonwealth*, 73 Va. App. 567, 579 (2021)). To satisfy his burden for each of the above points, the "defendant's

- 10 -

assertions must be 'sustained by proofs.'" *Id.* at ___ (quoting *Justus v. Commonwealth*, 274 Va. 143, 153-54 (2007)).

Smith argues that the trial court abused its discretion by denying his motion to withdraw his pleas. He maintains that he entered his pleas inadvisedly, under a time-crunch and not understanding the effect his pleas would have on his "railroad return pay." He contends that he "had a right to trial by jury" no matter his "motivation" for seeking to withdraw his pleas, "whether fear of the looming sentence, or his belief that he could present a valid defense." And his proffered defense was simply, "it's not true . . . I didn't do this. I'm being charged for something . . . I did not do. If I did this . . . I would own up to it. But I did not do the charges [that] are being brought against me."

A "reasonable defense" justifying withdrawal of a guilty plea "is one based upon a proposition of law . . . , or one supported by credible testimony, supported by affidavit." *Williams v. Commonwealth*, 59 Va. App. 238, 249 (2011) (first citing *Justus*, 274 Va. at 155; and then citing *Parris*, 189 Va. at 324). "It is a defense which reasonably supports the defendant's proffer: it is not a defense that is based solely upon a challenge to the credibility of a victim's testimony, especially when a defendant has admitted to the substance of such testimony." *Id.* "To hold otherwise would raise a bare challenge to the credibility of a victim or witness to that standard, one 'sustained by proofs,' necessary to permit the withdrawal of a plea of guilty. Such a challenge does not suffice." *Id.* Bare assertions that a defendant has a defense are not sufficient, and a trial court's "discretion [to grant the motion] will rarely, if ever, be exercised in aid of an attempt to rely upon a merely dilatory or formal defense." *Parris*, 189 Va. at 324-25.

Here, Smith's proffered defense consisted of nothing more than bare assertions that he was not guilty and that the allegations were "not true." He offered no credible testimony, supported by affidavit or otherwise, and instead advanced what amounts to a "bare challenge to

the credibility of [the] victim." *Williams*, 59 Va. App. at 249. Moreover, his admissions elsewhere that "some of" the allegations "might be true" and that he had recorded U.R. as she was "naked" in his garage, significantly undermined his assertions that the allegations were unfounded. Simply, his summary assertions, which were contradicted by his statements elsewhere, do not constitute a reasonable defense for purposes of a motion to withdraw a guilty plea. Thus, the trial court did not abuse its discretion by denying the motion. *See Holland*, ___ Va. at ___ (holding that under the doctrine of "'judicial restraint,'" if an appellate court determines one element of the test to withdraw a guilty plea was not met, the court need not "address the other[s]" (quoting *McGhee v. Commonwealth*, 280 Va. 620, 626 n.4 (2010))).

III. Sentencing

Smith argues that the trial court abused its sentencing discretion by imposing an active term that exceeded the discretionary sentencing guidelines. He emphasizes that he is 70 years old, so his sentence "is effectively a life sentence" and he will die incarcerated absent a "miracle" or "geriatric parole." He maintains that the court improperly rejected his sentencing argument and denied "what he thought might be the benefit of his bargain, that is the possibility of release during the course of his lifetime."

Sentencing decisions are left to the discretion of the trial court. *Scott v. Commonwealth*, 58 Va. App. 35, 46 (2011). "[W]hen a statute prescribes a maximum imprisonment penalty and the sentence does not *exceed* that maximum, the sentence will not be overturned as being an abuse of discretion." *Minh Duy Du v. Commonwealth*, 292 Va. 555, 564 (2016) (emphasis added) (quoting *Alston v. Commonwealth*, 274 Va. 759, 771-72 (2007)). Moreover, a trial court's decision not to sentence a defendant within the discretionary sentencing guidelines is "not . . . reviewable on appeal" and cannot be "the basis of any other post-conviction" relief. *Cf.* Code § 19.2-298.01(F). Rather, "once it is determined that a sentence is within the limitations set forth

in the statute under which it is imposed, appellate review is at an end." *Thomason v. Commonwealth*, 69 Va. App. 89, 99 (2018) (quoting *Minh Duy Du*, 292 Va. at 565). Here, Smith's sentences were not longer than the ranges set by the legislature. *See* Code §§ 18.1-67.1(A)(1), 18.2-67.2, 18.2-67.3, 18.2-374.1.

In addition, it was within the trial court's purview to weigh the mitigating circumstances of the case. *Keselica v. Commonwealth*, 34 Va. App. 31, 36 (2000). The record reveals that the trial court considered the mitigating factors Smith presented, including his age, remaining life expectancy, criminal record, and the witnesses who testified on his behalf. Balanced against those circumstances, however, were his egregious sexual offenses against U.R. on a near daily basis for more than five years. As the Commonwealth stated in closing, this case involves "a child molester who got away with it for years." He "preyed on a little girl he was supposed to nurture and protect" and "who trusted him." Moreover, at sentencing, he refused to accept responsibility for the offenses and instead blamed his minor victim for giving him "a view," stating that it was her "fault" that he recorded videos of her breasts and genitals while they were in the garage.

"Criminal sentencing decisions are among the most difficult judgment calls trial judges face." *Minh Duy Du*, 292 Va. at 563. "Because this task is so difficult, it must rest heavily on judges closest to the facts of the case—those hearing and seeing the witnesses, taking into account their verbal and nonverbal communication, and placing all of it in the context of the entire case." *Id.* After weighing the evidence in this case, the trial court imposed the sentences it deemed appropriate. Those sentences "do[] not exceed [the statutory] maximum," and our task is complete. *Id.* at 564-65.

CONCLUSION

For the foregoing reasons, the circuit court's judgment is affirmed.

*Affirmed.*